UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **TRIUMPH CHRISTIAN CENTER, INC.** | § | **CASE NO. 10-41239** |
| | § | **(Chapter 11)** |
| **Debtor** | § | |

MOTION FOR APPROVAL OF POST PETITION INTEREST, ATTORNEYS
FEES AND COSTS OF COUNSEL FOR
<u>FOUNDATION CAPITAL RESOURCES, INC.</u>

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AN MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

TO THE HONORABLE BANKRUPTCY COURT JUDGE:

**Foundation Capital Resources, Inc.,** ("FCR") and **Chernosky, Smith, Ressling & Smith, PLLC** (the "Firm"), pursuant to 11 U.S.C. §506 (b) files this Motion for Approval of Post Petition Interest, Attorneys Fees and Costs of the Firm as Counsel for FCR and would  show the Court as follows:

1.      Triumph Christian Center, Inc., (the "Debtor") filed a voluntary petition for relief on December 7, 2010, (the "Petition Date").

2.     FCR is the primary secured creditor of the Debtor.

3.     11 U.S.C. §506 (b) provides that to the extent an allowed secured claim is secured by property the value of which is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

4.     FCR's allowed secured claim is approximately $2.8 million.   The Debtor has scheduled the property securing the claim with a value of $3.8 million.  FCR believes the property is worth at least $3.0 million.  Inasmuch as the property securing FCR's claim is greater than the amount of FCR's claim, FCR is entitled to postpetition interest and its reasonable postpetition fees and costs under the Debtor's Adjustable Rate Secured Note of December 10, 2008, payable to FCR (the "Note") (Exhibit "1" attached), and the Debtor's Deed of Trust of even date (Exhibit "2" attached).

5.     Under the Note, interest accrues at 9% per annum upon conversion from construction financing to permanent financing.  Conversion occurred June 15, 2010, and interest has been accruing at the rate of 9% per annum.

6.     The Firm is Counsel for FCR and has rendered services on behalf of FCR in this proceeding after the Petition Date.

7.     On July 15, 2011, the Debtor filed a First Amended Plan of Reorganization [**Docket #53**] pursuant to which FCRs allowed Secured Claim includes accrued interest and the reasonable attorney fees of FCR's counsel on and after the Petition Date.

8.     Attached as Exhibit "B-1" is a true and correct copy of the Firm's client ledger (with the attorney client privileged material and attorney work product information redacted) detailing all

attorney fees and costs billed by the Firm to FCR for postpetition charges sworn by FCR's counsel in Exhibit "B" attached hereto to be a true and correct copy of same and such fees to be reasonable. An unredacted copy of the client ledger has been delivered to the Judge's chambers for *in camera* review.

9.      The ledger details the Firm's total attorneys fees and costs for the time period of December 13, 2010, through August 23, 2011, the date for the confirmation hearing of the Debtor's Plan.   The total attorney fees postpetition are $8,497.50.   There are no postpetition costs. Accordingly, this Motion seeks approval of the payment of FCR's postpetition interest accruing under the Note and the Firm's reasonable post petition attorney fees in the amount of $8,497.50.

**WHEREFORE, PREMISES CONSIDERED**, FCR and the Firm request that the Motion be granted.

Respectfully submitted,

**CHERNOSKY, SMITH, RESSLING & SMITH, PLLC**

By:___/S/ MICHAEL J. SMITH_____
          MICHAEL J. SMITH
          TBA No. 18650880
          4646 Wild Indigo, Suite 110
          Houston, Texas 77027
          Telephone:     (713) 800-8608
          Facsimile:     (713) 622-1026
          **Attorneys for Movant, Foundation Capital Resources, Inc.**

**Certificate of Service and Certificate of Compliance**

A copy of this motion was served on the persons shown on **Exhibit "A"** at the addresses reflected on that exhibit on August 5, 2011, by prepaid United States first class mail or by electronic notice as indicated.

          ___/S/ MICHAEL J. SMITH_____
          Movant's Counsel

## ADJUSTABLE RATE SECURED NOTE—CONSTRUCTION

$2,433,500.00
Loan No. 6005075

December 10, 2008
Fort Bend County, Texas

FOR VALUE RECEIVED, TRIUMPH CHRISTIAN CENTER, INC., a Texas domestic nonprofit corporation, 6601 FM 762 Road, Richmond, Texas 77469 (the "**Borrower**"), promises to pay in legal tender of the United States to the order of FOUNDATION CAPITAL RESOURCES, INC., a Georgia corporation, and its successors and assigns (collectively, the "**Lender**"), at the address of 1661 North Boonville Avenue, Springfield, Missouri 65803, or at such other place as the Lender may designate in writing, the principal sum of up to TWO MILLION FOUR HUNDRED THIRTY-THREE THOUSAND FIVE HUNDRED AND 00/100 DOLLARS ($2,433,500.00), or so much thereof as may be advanced from time to time, together with interest as hereinafter provided (the "**Interest Rate**") on the unpaid principal balance from the date hereof, to be paid as set forth herein.

Interest will be charged on unpaid principal until the full amount of principal has been paid. During construction, Borrower will pay interest at an initial rate of nine and forty-five one-hundredths percent (9.45%) per annum. Upon conversion to permanent financing, Borrower will pay interest at the rate of nine percent (9%) per annum. The interest rate Borrower will pay will change in accordance with the terms of this Note as set forth herein below. Interest shall be computed hereunder with respect to each day during the term of this Note by multiplying the outstanding principal balance due hereunder on that day by a daily interest factor, which daily interest factor shall be calculated (on the basis of a year of 365 days) by dividing the aforesaid per annum interest rate by 365. Interest so computed shall accrue for each and every day on which any indebtedness remains outstanding hereunder, including the day on which funds are initially advanced regardless of the time of day such advance is made, and including the day on which funds are repaid unless repayment in federal funds immediately available in the city in which Lender or its agent servicing this loan are located, is received by Lender prior to 11:00 a.m., local time in such city.

Commencing on January 15, 2009, and continuing on the same day of each succeeding month thereafter up to and including May 15, 2010, the Borrower shall pay monthly installments of interest only. On June 15, 2010, all accrued interest and any other charges, as described herein below, shall be due and payable in full. In the event that no Event of Default then exists under the Security Instrument (hereinafter defined) securing this Note, this loan shall convert to permanent financing with payments as hereinafter provided. If any Event of Default exists under said Security Instrument, this loan and the outstanding indebtedness may, in Lender's sole discretion, be accelerated and be due and payable in full.

Upon conversion to permanent financing, Borrower will make two hundred thirty-nine (239) monthly payments of principal and interest, based on a loan amortization of thirty (30) years, on the 15th day of each month beginning on July 15, 2010, and will make a final payment of all outstanding principal and accrued outstanding interest, together with accrued and unpaid late fees and other charges on the Maturity Date, as said item is hereinafter defined. Borrower will make said payments every month until Borrower has paid all of the principal and interest and any other charges described below that Borrower may owe under this Note. Borrower's monthly payments will be applied first to late fees and other charges, then to interest, and finally to principal. If on June 15, 2030, Borrower still owes amounts under this Note, Borrower will pay those amounts in full on that date, which is called the "**Maturity Date.**"



**EXHIBIT**

_____

Each of Borrower's initial monthly principal and interest payments will be in the amount of NINETEEN THOUSAND FIVE HUNDRED EIGHTY AND 49/100 DOLLARS ($19,580.49) based on said thirty (30) year amortization.

The interest rate Borrower will pay may change on December 15, 2011, and on that day every thirty-six (36) months thereafter. Each date on which Borrower's interest rate could change is called a "Change Date." Beginning with the first Change Date, Borrower's interest rate will be reset at a rate equal to the then prevailing interest rate charged by the Noteholder on similar loans as established by Noteholder's internal rate committee effective at the Change Date. This rate will be Borrower's new interest rate until the next Change Date. The Lender will then determine the amount of the monthly payment based on the remaining term of the original amortization period at Borrower's new interest rate. The result of this calculation will be the new amount of Borrower's monthly payment. The Lender will give Borrower notice of this change.

Except as herein provided, under no circumstances and at no time will the interest rate on this Note be less than nine percent (9%) per annum except as may otherwise be agreed to in writing. Under no circumstances and at no time will the interest rate on this Note be more than the maximum rate allowed by Law.

Lender and Borrower agree that the Note may be prepaid in whole or in part, without penalty, provided that the prepayment is not made with funds borrowed by or for the benefit of Borrower or an affiliated or related entity of the Borrower ('Borrowed Funds'). Prepayment resulting from donations or offerings made to the Borrower or from the sale of the Property to an unrelated and unaffiliated entity shall not be considered prepayment from Borrowed Funds.

If Borrower makes a full prepayment of the Note with Borrowed Funds (i) within the first twelve (12) months from the date of the Note, there will be a charge of four percent (4%) of the principal balance of the Note as a prepayment charge; (ii) during the 13th month through the 24th month from the date of the Note, there will be a charge of three percent (3%) of the principal balance of the Note as a prepayment charge; (iii) during the 25th month through the 36th month from the date of the Note, there will be a charge of two percent (2%) of the principal balance of the Note as a prepayment charge; (iv) during the 37th through the 48th month from the date of the Note, there will be a charge of one percent (1%) of the principal balance of the Note as a prepayment charge. If the Borrower makes a full prepayment after the 48th month from the date of the Note, there shall be no prepayment charge, whether or not said repayment is made with Borrowed Funds.

Prepayments shall be applied against the outstanding principal balance of this Note and shall not extend or postpone the due date of any subsequent monthly installments or change the amount of such installments, unless the Lender shall agree otherwise in writing. Prepayments shall include a payment arising from the acceleration of the Note by the Lender as a result of event(s) of default under the terms of the Loan Documents.

This Note is secured by, and Lender is entitled to the benefits of, the Security Instrument, the UCC-1 Financing Statements and the other Loan Documents (hereinafter defined). The term "Security Instrument" means the Deed of Trust, Assignment of Leases and Rents and Security Agreement dated the date hereof given by Borrower for the use and benefit of Lender covering the estate of Borrower in certain premises as more particularly described therein (which premises, together with all properties, rights, titles, estates and interests now or hereafter securing the debt and/or other obligations of Borrower under the Loan Documents, are collectively referred to herein as the "Property"). The term "Loan Documents" refers collectively to this Note and the Security Instrument and all other documents executed in connection with this Note or now or hereafter executed by Borrower and/or others and by or

in favor of Lender, which wholly or partially secure or guarantee payment of this Note or pertains to indebtedness evidenced by this Note.

A late charge of ten percent (10%) of the amount of the monthly payment as set forth herein (including the final payment due on the Maturity Date), shall be paid to the Lender for any monthly payment not received within ten (10) days of the due date. For purposes of assessing a late fee, a payment will be considered late unless it is received in federal funds immediately available in the city in which Lender or its agent servicing this loan are located, prior to 11:00 a.m., local time in such city, by the 10th day after the due date.

Should the Borrower default in the payment, as and when due, of the indebtedness evidenced hereby, or should any warranty or representation made by the Borrower hereunder or in any of the Loan Documents prove to be materially false or misleading, or should the Borrower default in the performance of any of the covenants, terms or conditions contained in the Loan Documents, then the entire unpaid principal balance of the indebtedness evidenced hereby, together with all interest accrued but unpaid thereon, and any late fees and other charges and all sums advanced by the Lender to or on behalf of the Borrower under the provisions of the Loan Documents (even though the aggregate of such amounts may exceed the face amount of this Note) shall, at the option of the Lender and without further demand or notice, at once become due and payable and may be collected forthwith regardless of the stipulated date of maturity; and the entire principal amount outstanding shall accrue interest at a "Default Rate" equal to five percent (5.0%) above the Interest Rate being otherwise charged hereunder, as of the first day of the breach, at the option of the Lender, until paid.

It is further agreed that failure of the Lender to exercise this right of accelerating the maturity of the debt, or indulgence granted from time to time, shall in no event be considered as a waiver of such rights of acceleration or estop the Lender from exercising such right.

Time is of the essence of this Note.

Should this Note, or any part of the indebtedness evidenced hereby, be collected by law or through an attorney-at-law, the Lender shall be entitled to collect attorneys' fees and all costs of collection.

Except as otherwise expressly provided in the Security Instrument, no failure to accelerate the debt evidenced hereby by reason of default hereunder, acceptance of a past due installment, or indulgences granted from time to time shall be construed (i) as a novation of this Note or as a reinstatement of the indebtedness evidenced hereby or as a waiver of such right of acceleration or of the right of the Lender thereafter to insist upon strict compliance with the terms of this Note, or (ii) to prevent the exercise of such right of acceleration or any other right granted hereunder or by the laws of the state where the Property is located; and the Borrower hereby expressly waives the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing. No extension of the time for the payment of this Note or any installment due hereunder, made by agreement with any person now or hereafter liable for the payment of this Note shall operate to release, discharge, modify, change or affect the original liability of the Borrower under this Note, either in whole or in part unless the Lender agrees otherwise in writing.

This Agreement supersedes all prior discussions and agreements between the parties hereto with respect to this transaction and all matters contained herein; and this Agreement contains the sole and entire understanding between the parties hereto. This Note may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

Presentment, notice of demand, notice of protest, notice of payment or non-payment, notice of dishonor, protest, and all other notices are hereby waived by the Borrower, and all sureties, guarantors, and endorsers hereof. The Borrower hereby waives and renounces for itself, its partners, successors and assigns, all rights to the benefits of any statute of limitations and any moratorium, reinstatement, marshalling, forbearance, valuation, stay, extension, redemption, appraisement, exemption and homestead now provided, or which may hereafter be provided by the Constitution and laws of the United States of America and of any state thereof, both as to itself and in and to all of its property, real and personal, against the enforcement and collection of the obligations evidenced by this Note. The Borrower hereby transfers, conveys and assigns to the Lender a sufficient amount of such homestead or exemption as may be set apart in bankruptcy, to pay this Note in full, with all costs of collection, and does hereby direct any trustee in bankruptcy having possession of such homestead or exemption to deliver to the Lender a sufficient amount of property or money set apart as exempt to pay the indebtedness evidenced hereby, or any renewal thereof, and does hereby appoint the Lender the attorney-in-fact for the Borrower to claim any and all homestead exemptions allowed by Law.

All makers, endorsers, sureties and guarantors hereof, as well as all other parties to become liable on this Note, hereby severally: (i), waive notice of default, demand, notice of intent to demand, presentment for payment, notice of non-payment, protest, notice of protest, grace, notice of intent to accelerate maturity, notice of acceleration of maturity, filing of suit, diligence in collection or enforcing any of the security for this Note; (ii) except as specifically provided otherwise in the Security Instruments, agree that they are and shall be jointly, severally, directly and primarily liable for the repayment of all sums due and owing under this Note; (iii) consent to any and all renewals, extensions and modification in the time of payment and to any other indulgence with respect to this Note; (iv) agree that Payee shall not be required first to institute suit or exhaust its remedies against Maker or others liable or to become liable on this Note, or to enforce its rights against them or any security for this Note; (v) agree to any substitution, subordination, exchange or release of any security for this Note, or the release of any party primarily or secondarily liable on this Note; and (vi) acknowledge that Payee has no duty of good faith to Maker and that no fiduciary, trust or other special relationship exists between Maker and Payee. Maker acknowledges and agrees that it may be required to pay this Note in full without assistance from any other party, or any collateral or security for this Note. Payee shall not be required to mitigate damages, file suit, or take any action to foreclose, proceed against, or exhaust any collateral or security in order to enforce the payment of this Note.

This Note is intended as a contract under and shall be construed and enforceable in accordance with the laws of the State of Missouri.

If from any circumstances whatsoever, fulfillment of any provision of this Note or of any other instrument evidencing or securing the indebtedness evidenced hereby, at the time performance of such provision shall be due, shall involve transcending the limit of validity presently prescribed by any applicable usury statute or any other applicable law, with regard to obligations of like character and amount, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, so that in no event shall any exaction be possible under this Note or under any other instrument evidencing or securing the indebtedness evidenced hereby, that is in excess of the current limit of such validity, but such obligation shall be fulfilled to the limit of such validity.

As used herein, the terms "Borrower" and "Lender" shall be deemed to include their respective heirs, successors, legal representatives and assigns, whether by voluntary action of the parties or by operation of law. In the event that more than one person, firm or entity is a Borrower hereunder, then all references to "Borrower" shall be deemed to refer equally to each of said persons, firms, or entities, all of whom shall be jointly and severally liable for all of the obligations of the Borrower hereunder.

*Triumph Christian Center, Inc.*                                          *Adjustable Rate Secured Note (00050751 - page 4*

**ADDITIONAL TERMS:** As additional consideration to Lender in making this loan, Borrower agrees to the following conditions:

1.      Borrower agrees to make monthly payments by Automated Clearing House (ACH).  In the event ACH payments are terminated for any reason, Borrower acknowledges that the interest rate on the loan will increase by one percent (1%) over the stated rate and that payments will be adjusted accordingly.

2.      Borrower agrees not to create, incur, assume, or suffer to exist any indebtedness in excess of $25,000.00 during any single fiscal year (including lease obligations), as of the date of this Note, without the prior written consent of Lender.

Failure to comply with any condition will be considered an Event of Default under the terms of this Note.

**IN WITNESS WHEREOF,** this Note has been duly executed by the undersigned on the date and year first above written.

BORROWER:

TRIUMPH CHRISTIAN CENTER, INC.

By: _____

Ladell Graham, Pastor/President

ATTEST:

_____

Gwendolyn Graham, Corporate Secretary

26 PGS

DEED OF TRUST, ASSIGNMENT OF LEASES
AND RENTS AND SECURITY AGREEMENT

GRANTOR/BORROWER       **TRIUMPH CHRISTIAN CENTER, INC.**, a Texas domestic
                       nonprofit corporation

GRANTEE/BENEFICIARY    **FOUNDATION CAPITAL RESOURCES, INC.**, a Georgia
                       corporation

GRANTEE/TRUSTEE        **WILLIAM A. HUNT, JR.**

LEGAL DESCRIPTION:     See attached Exhibit "A"

AFTER RECORDING
RETURN TO:             Foundation Capital Resources, Inc.
                       Post Closing
                       1661 North Boonville Avenue, Suite 1
                       Springfield, MO 65803

NOTICE OF CONFIDENTIALITY RIGHTS:

IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF ALL OF THE
FOLLOWING INFORMATION FROM AND INSTRUMENT THAT TRANSFERS AN INTEREST
IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS:  YOUR
SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER



**EXHIBIT**

2

# DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT

THIS DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT ("Security Instrument"), effective December 10, 2008, by TRIUMPH CHRISTIAN CENTER, INC., a Texas domestic nonprofit corporation, ("Borrower"), whose address is 6601 FM 762 Road, Richmond, Texas 77469, to WILLIAM A. HUNT, JR. ("Trustee"), whose address is 1661 North Boonville Avenue, Springfield, Missouri 65803, in favor of FOUNDATION CAPITAL RESOURCES, INC., a Georgia corporation, ("Lender"), whose address is 1661 North Boonville Avenue, Springfield, Missouri 65803.

## GRANTING CLAUSE

Lender is making a loan to Borrower in the total amount of up to TWO MILLION FOUR HUNDRED THIRTY-THREE THOUSAND FIVE HUNDRED AND 00/100 DOLLARS ($2,433,500.00) (the "Loan"). In consideration of the Loan, Borrower hereby irrevocably grants, conveys, transfers and assigns to Trustee, its successors and assigns, in trust, with power of sale and right of entry and possession as provided below, all of its present and future estate, right, title and interest in and to the property now or hereafter acquired as described on Exhibit "A" attached hereto and incorporated herein (the "Property") and all minerals, oil, gas and other hydrocarbon substances on or under the surface of the Property, as well as all development rights, permits, licenses, air rights, water, water rights, and water stock relating to the Property.

All present and future structures, buildings, improvements, appurtenances and fixtures of any kind on the Property, all apparatus, equipment and appliances used in connection with the operation or occupancy of the Property, such as heating and air-conditioning systems and facilities used to provide any utility services, refrigeration, ventilation, laundry, drying, dishwashing, garbage disposal, recreation or other services on the Property, and all window coverings, drapes and rods, carpeting and floor coverings, it being intended and agreed that all such items will be conclusively considered to be part of the Property conveyed by this Security Instrument, whether or not attached or affixed to the Property ("Improvements").

All appurtenances of the Property and all rights of Borrower in and to any streets, roads or public places, easements or rights of way, relating to the Property.

All of the rents, royalties, profits and income of the Property ("Rents"), and all rights of Borrower under all present and future leases affecting the Property, including but not limited to any security deposits.

All proceeds and claims arising on account of any damage to or taking of the Property or any Improvements thereon or any part thereof, and all causes of action and recoveries for any loss or diminution in the value of the Property or any Improvements.

TO HAVE AND TO HOLD the Property with all privileges and appurtenances thereunto belonging, to Trustee, his heirs, successors and assigns forever, with power of sale, upon the trusts, terms and conditions, and for the uses hereinafter set forth.

## SECURED OBLIGATIONS

This Security Instrument secures the following obligations ("Obligations"):

A.      **LOAN.**  Payment and performance of Borrower's indebtedness and obligations under that certain Adjustable Rate Secured Note of even date herewith in the amount of up to TWO MILLION FOUR HUNDRED THIRTY-THREE THOUSAND FIVE HUNDRED AND 00/100 DOLLARS ($2,433,500.00) which provides for an adjustable rate of interest (the "**Note**"), including all extensions, renewals and modifications of the Note, and any additional note or notes.

The payment of the principal and interest on all other future loans or advances made by Lender to Borrower (or any successor in interest to Borrower as the owner of all or any part of the Property) when the note evidencing such loan or advance specifically states that it is secured by this Security Instrument ("**Future Advances**"), including all extensions, renewals and modifications of any Future Advances.

B.      **OTHER OBLIGATIONS.**  The payment and performance of Borrower's obligations under this Security Instrument.  The payment of all sums advanced or paid out by Trustee or Lender under or pursuant to any provision of this Security Instrument or to protect the security of this Security Instrument, together with interest thereon as provided herein.

C.      **MATURITY.**  The Note secured hereby matures on June 15, 2030.

## WARRANTY OF TITLE

Borrower warrants that Borrower lawfully possesses and holds fee simple title to the Property without limitation on the right to encumber, and that this Security Instrument is a valid first and priority lien on the Property subject only to the encumbrances set forth in Schedule B-1 of the title insurance policy issued in favor of Lender insuring such lien.  Borrower, at its sole cost and expense, shall at all times keep, protect, defend, and maintain title to the Property free and clear of any liens or encumbrances that would or could impair the validity or priority of this Security Instrument.

## ARTICLE 1
## COVENANTS OF BORROWER

To protect the security of this Security Instrument, Borrower agrees:

1.1.      **Performance.**  Borrower agrees to pay all indebtedness and perform all obligations that are secured by this Security Instrument in accordance with their terms.

1.2.      **Insurance.**  Borrower shall maintain or cause to be maintained in force, until full payment of the Loans, policies of insurance satisfactory to Lender as follows: (a) fire and extended coverage insurance, including loss or damage by vandalism, malicious mischief, and such other insurable hazards as Lender shall reasonably require.  The amount of such insurance shall be satisfactory to Lender and shall be equal to the greater of the amount of the Loan or 100% of the full replacement cost of the improvements, based on the insurer's agreed value under a full replacement cost endorsement without co-insurance.  "Full replacement cost," as used herein, means the cost of replacing the improvements, exclusive of the cost of excavation, foundations, and footings: (b) all furniture, fixtures, and equipment

necessary for the operation of the Improvements shall be insured against loss by burglary, theft, or mysterious disappearance; (c) flood insurance, in the event the improvements are located within a 100-year flood plain and such insurance is available pursuant to the provisions of the Flood Disaster Protection Act of 1973 or other applicable legislation; (d) comprehensive general liability insurance, including explosion and collapse coverage, covering personal injury and property damage with adequate coverage; (e) while any persons are employed by Borrower, workers' compensation and employer's liability insurance and other insurance required by law; and (f) to the extent available, business interruption insurance of twelve (12) month terms. Each policy of insurance shall be issued by a company approved by Lender and qualified to do business in the state where the Property is located. All premiums on insurance policies shall be paid, by Borrower making payment, when due, directly to the carrier, or in such other manner as Lender may designate in writing.

All insurance policies and renewals thereof shall be in a form acceptable to Lender. Lender shall have the right to hold the policies, and Borrower shall promptly furnish to Lender all renewal notices and all receipts of paid premiums. At least thirty (30) days prior to the expiration date of a policy, Borrower shall deliver to Lender a renewal policy in form satisfactory to Lender.

1.3.   **Assignment of Proceeds.**  All insurance proceeds on the Property, all proceeds of a sale of all or any portion of the Property, and all causes of action, claims, compensation, awards and recoveries for any damage, condemnation or taking of all or any part of the Property or for any damage or injury to it or for any loss or diminution in value of the Property, are hereby assigned to and shall be paid to Lender. At Lender's option, Lender may appear in and prosecute (either in its own name or in the name of Borrower) or participate in any suits or proceedings relating to any such proceeds, causes of actions, claims, compensation, awards or recoveries and may adjust, compromise or settle any claim in connection therewith. Lender shall apply any sums received by it under this Section 1.3 first to the payment of all of its reasonable costs and expenses (including but not limited to legal fees and disbursements) incurred in obtaining those sums, and then, in its absolute discretion and without regard to the adequacy of its security, to the payment of the indebtedness and obligations secured by this Security Instrument, except as provided in Section 1.10 below. Any application of such funds to the indebtedness secured hereby shall not be construed to cure or waive any Event of Default or invalidate any acts of Lender arising out of such Event of Default.

1.4.   **Taxes and Assessments.**  Borrower agrees to pay when due all taxes, fees, impositions, and assessments which are or may become a lien on all or any portion of or interest in the Property or which are assessed against the Property or its rents, royalties, profits and income. Borrower also agrees to pay when due all lawful claims and demands of mechanics, materialmen, laborers and others for any work performed or materials delivered with respect to the Property. In the event of the passage after the date of this Security Instrument of any law of the state where the Property is located, deducting from the value of land, for the purpose of taxation, any lien thereon, or changing in any way the laws now in force for the taxation of deeds of trust or debts secured by deeds of trust for state or local purposes or the manner of the collection of such taxes so as to affect this Security Instrument, the entire principal balance under said Note, together with all accrued interest thereon, at the option of Lender, without demand or notice, forthwith shall become due and payable; provided, however, that such option shall be ineffective if Borrower is permitted by law to pay the whole of such tax, in addition to all other payments required hereunder, and, if prior to such specified date, Borrower does pay such tax and agrees to pay any such tax when hereafter levied or assessed against the Property, and such agreement shall constitute a modification of this Security Instrument.

1.5.   **Perfection of Security.**  Borrower agrees to execute and deliver to Lender, from time to time on demand and at Borrower's cost and expense, any documents required to perfect and continue the perfection of Lender's interest in the Property.

1.6.     Acceleration.   Without the prior written consent of Lender (which consent may be withheld in Lender's sole and absolute discretion), Borrower shall not sell, encumber, assign, contract to sell, grant an option to sell, lease, or otherwise transfer or convey the Property or any portion thereof or interest therein or suffer its title therein to be divested whether voluntarily, by operation of law or otherwise, and Borrower shall not dissolve, cease doing business or terminate its existence.   If such an event occurs without Lender's prior written consent, Lender may, in its sole option and upon written notice to Borrower, accelerate the maturity date of the sums secured hereby and declare all such sums immediately due and payable.

1.7.     Waste; Changes in Zoning; Subdivision.

1.7.1.    Borrower (a) shall not commit waste or permit impairment or deterioration of the Property or take any actions that might invalidate any insurance carried on the Property, (b) shall not abandon the Property, (c) shall restore or repair promptly and in a good and workmanlike manner all or any part of the Property to the equivalent of its original condition, in the event of any damage, injury or loss thereto, whether or not insurance proceeds are available to cover in whole or in part the costs of such restoration or repair, (d) shall keep the Property, including improvements, fixtures, equipment, machinery and appliances thereon in good repair and shall replace fixtures, equipment, machinery and appliances on the Property when necessary to keep such items in good repair, (e) shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property, and (f) shall give notice in writing to Lender of and, unless otherwise directed in writing by Lender, appear in and defend any action or proceeding purporting to affect the Property, the security of this Security Instrument or the rights or powers of Lender. Lender shall have the right, but not the obligation, to enter upon and take possession of the Property and to make additions, alterations, repairs, or improvements to the Property which Lender may consider necessary or proper to keep the Property in good condition and repair.   No Improvements may be removed, demolished or materially altered without the prior written consent of Lender, which Lender may withhold in its sole and absolute discretion.   No personal property in which Lender has a security interest may be removed from the Property unless it is immediately replaced by similar property of at least equivalent value on which Lender will immediately have a valid first lien and security interest.

1.7.2.    Without the prior written consent of Lender, which Lender may withhold in its sole and absolute discretion, Borrower shall not seek, make or consent to any change in the zoning or conditions of use of the Property. Borrower, at its sole cost, shall comply with and make all payments required under the provisions of any covenants, conditions or restrictions affecting the Property, including but not limited to those contained in any declaration and constituent documents of any condominium, cooperative or planned development project on the Property. Borrower, at its sole cost, shall comply with all existing and future requirements of all governmental authorities having jurisdiction over the Property.

1.7.3.    If this Security Instrument covers a subdivision or common interest development ("Subdivision"), as defined under any law of the state where the Property is located which relates to the development or sale of a "common interest development" or a "subdivision," Borrower shall obtain, comply with and keep in effect all present and future permits, maps, bonds and other agreements required by applicable laws and regulations for the lawful construction or sale of the Subdivision lots and/or units. Borrower must also maintain an active sales program for the Subdivision, and always be in a position to convey insurable title to the lots and/or units to purchasers.

### 1.8.    Books and Records.

1.8.1.    Borrower shall keep adequate books and records of account of the Property and its own financial affairs on a cash basis sufficient to permit the preparation of financial statements therefrom in accordance with generally accepted accounting principles. Lender shall have the right to examine, copy and audit Borrower's records and books of account at all reasonable times. If the Property is at any time used for commercial or residential income purposes, Borrower will deliver to Lender, upon request, certified financial statements and profit-and-loss statements for Borrower and the Property prepared in accordance with generally accepted accounting principles.

1.8.2.    Borrower will promptly furnish from time to time, upon Lender's request, a duly acknowledged written statement setting forth all amounts due on the indebtedness secured by this Security Instrument and stating whether any offsets or defenses exist, and containing such other matters as Lender may reasonably require.

### 1.9.    Defend Security.

Borrower shall, at its own expense, appear in and defend any action or proceeding that might affect Lender's security or the rights or powers of Lender or Trustee or that purports to affect any of the Property. If Borrower fails to perform any of its covenants or agreements contained in this Security Instrument or any of the other Loan Documents, or if any action or proceedings of any kind (including but not limited to any bankruptcy, insolvency, arrangement, reorganization or other debtor relief proceeding) is commenced which might affect Lender or Trustee's interest in the Property or Lender's right to enforce its security, then Lender and/or Trustee may, at their option, make any appearances, disburse any sums and take any actions as may be necessary or desirable to protect or enforce the security of this Security Instrument or to remedy the failure of Borrower to perform its covenants, including without limitation payment on behalf of Borrower of any taxes, assessments, liens, insurance premiums, and repair or maintenance costs (without, however, waiving any default of Borrower). Borrower agrees to pay all reasonable out-of-pocket expenses of Lender and Trustee thus incurred (including but not limited to fees and disbursements of counsel). Any sums disbursed or advanced by Lender or Trustee shall be additional indebtedness of Borrower secured by this Security Instrument and shall be payable by Borrower upon demand. Any such sums so disbursed or advanced by Lender shall bear interest at the Default Rate as set forth in the Note, and any such sums so disbursed or advanced by Trustee shall bear interest at the maximum rate permitted to be charged by Trustee under applicable law. This Section 1.9 shall not be construed to require Lender to incur any expenses, make any appearances, or take any other actions.

### 1.10.    Damage and Destruction.

1.10.1. If the Property, or any portion thereof, is destroyed (in whole or in part), or is damaged by fire or other casualty, Borrower shall be obligated to continue to pay the Loans. Borrower shall give Lender prompt written notice of any such destruction or damage in excess of Ten Thousand Dollars ($10,000.00).

1.10.2. Prior to the termination of this Security Instrument, the proceeds from any insurance resulting from any events described in the preceding Section less all expenses related thereto (the "Net Proceeds") shall be deposited in a trust fund to be known as the "Insurance Proceeds Fund". All Net Proceeds shall be applied in one or more of the following ways, as elected by Borrower in a written notice to Lender.

**1.10.2.1.** To the prompt repair, restoration, modification or improvement of the Property by Borrower, upon receipt by Lender of written request on applicable forms for each draw request accompanied by supporting invoices, statements, bills and approved construction draw form, signed by an officer or individual authorized to make draw requests on behalf of the Borrower; or

**1.10.2.2.** Toward the purchase of additional property, against which Borrower shall give a first lien to Lender; or

**1.10.2.3.** To the prepayment of the Loan in the same manner as partial prepayments are to be applied under the provisions of the Note, but without any premium or penalty; or

**1.10.2.4.** A combination of these purposes.

Any balance of the Net Proceeds remaining shall be paid to Borrower.

**1.10.3.** If the Net Proceeds are insufficient to pay in full the costs of the repair, restoration, modification or improvement required hereunder, Borrower will nevertheless complete the work so that the Property is in substantially the same condition as existed prior to such damage or destruction, or is in a condition of at least equivalent value and function, and Borrower will pay any cost in excess of the amount of the Net Proceeds held by Lender. Lender shall not be required to confirm the availability of such excess.

When Borrower has complied with all of the preceding portions of this Section 1.10, Lender may condition disbursement of the sums specified in subsection 1.10.3 above to Borrower on terms and conditions such as those governing disbursements of loan funds in construction loans made by Lender for similar properties.

**1.11.** __Condemnation.__

**1.11.1.** If title to all, or substantially all, of the Property shall be taken or condemned by competent authority for any public use or purpose, the gross amount awarded, less all attorneys' fees and other expenses and costs in the condemnation proceeding (the "Net Condemnation Award") shall be applied to the prepayment of the Loan in the same manner as partial prepayments are to be applied under the provisions of the Note. Any balance of the Net Condemnation Award shall be paid to Borrower. In the event the Net Condemnation Award shall be insufficient to pay in full the amount necessary to pay all outstanding principal, interest, Lender's fees and other costs applicable to the Loans, Borrower shall pay the amount of any such deficiency.

**1.11.2.** If less than substantially all of the Property shall be taken or condemned by competent authority for any public use or purpose, neither the term nor any of the obligations of Borrower under this Security Instrument shall be affected or reduced in any way.

**1.11.2.1.** If any part of the Property is taken, Borrower shall proceed to repair, replace, restore or rebuild the remaining parts so that the Property is in substantially the same condition as immediately prior to such condemnation or is in a condition of at least equivalent value and function.

**1.11.2.2.** The entire Net Condemnation Award, less expenses, shall be paid to the Borrower for use in repairing, restoring replacing and rebuilding as provided hereinabove. Said Award shall be transferred to the Borrower in the same manner as insurance proceeds are made available. If the Net Condemnation Award is less than the amount necessary for the Borrower to repair, replace,

restore and rebuild, as set forth hereinabove, Borrower shall nevertheless complete the repair, replacement, restoration or rebuilding and pay the costs thereof. Lender shall not be required to confirm the availability of such excess.

1.11.2.3.  If the Net Condemnation Award is in excess of the amount necessary to repair, replace, restore and rebuild, such excess shall be paid to Lender to be applied to (i) the prepayment of the Loan in the same manner as partial prepayments are to be applied under the provisions of the Note, (ii) purchase of additional property against which Borrower shall give a first lien to Lender, or (iii) to construct additional improvements on the Property remaining under the lien. The Borrower has the right to select which of the above and foregoing alternatives it desires to exercise, and shall notify Lender, in writing, which alternative is selected by Borrower.

1.11.3.  Borrower shall be obligated to continue to make all payments required hereunder pending any such condemnation proceeding, and thereafter unless the Loans are paid in full.

1.11.4.  Lender is authorized to join in and consent to deeds in lieu of condemnation as requested by Borrower upon receipt of a copy of the written agreement between the condemning authority and the Borrower.

1.12.  **Security Agreement and Fixture Filing.**  This Security Instrument is intended to be and shall constitute a security agreement as defined in the Uniform Commercial Code, the Borrower being the Debtor and the Beneficiary being the Secured Party. Borrower hereby grants Beneficiary a security interest in any items of personal property described in Exhibit "B" attached hereto which are not herein effectively made a part of the real property, for the purpose of securing all indebtedness and other obligations of Borrower now or hereafter secured by this Security Instrument. Borrower agrees to execute and deliver financing and continuation statements covering said property from time to time in such form as Beneficiary may require to perfect and continue the perfection of Beneficiary's security interest with respect to said property, and to reimburse Beneficiary for any costs incurred in filing such financing statements and any continuation statements. Borrower shall not create or allow the creation of any other security interest in said property. Upon the occurrence of any default by Borrower hereunder, Beneficiary shall have the rights and remedies of a secured party under the Uniform Commercial Code, as well as all other rights and remedies available at law or in equity or as provided herein, all at Beneficiary's option. Borrower and Beneficiary agree that the filing of a financing statement in the records normally having to do with personal property shall never be construed as in any way derogating from or impairing this declaration and the hereby stated intention of the parties hereto that everything used in connection with the operation or occupancy of said property or the production of income therefrom is and, at all times and for all purposes and in all proceedings, both legal and equitable, shall be regarded as real property encumbered by this Security Instrument, irrespective of whether (a) any such item is physically attached to the buildings and improvements, (b) serial numbers are used for the better identification of certain equipment, or (c) any such item is referred to or reflected in any such financing statement so filed at any time.  Such mention in the financing statement is declared to be for the protection of the Beneficiary in the event any court or judge shall at any time hold that notice of Beneficiary's priority of interest must be filed in the Uniform Commercial Code records to be effective against a particular class of persons, including, but not limited to, the federal government any subdivision or entity of the federal government.

1.13.  **Compensation; Exculpation; Indemnification.**

1.13.1.  Borrower hereby agrees to indemnify Trustee and Lender against, and holds it harmless from all losses, damages, liabilities, claims, causes of action, judgments, court costs, attorneys fees and other legal expenses, cost of evidence of title, cost of evidence of value, and other expenses

which either may suffer or incur (a) by reason of this Security Instrument; or (b) by reason of the execution of this trust or in performance of any act required or permitted hereunder or by law; or (c) as a result of any failure of Borrower to perform Borrower's obligations; or (d) by reason of any alleged obligation or undertaking on Lender's part to perform or discharge any of the representations, warranties, conditions, covenants or other obligations contained in any other document related to the Property. Notwithstanding the foregoing, Borrower shall not be liable under this subsection 1.13.1 to the extent that Borrower establishes that such liability is attributable solely and directly to the gross negligence or willful misconduct of Trustee or Lender.

　　　　1.13.2.  Borrower shall pay all indebtedness arising under this Section 1.13 immediately upon demand by Trustee or Lender together with interest thereon from the date the indebtedness arises at the Default Rate of interest set forth in the Note (after giving effect to any notice and/or cure periods). Borrower's duty to indemnify Lender shall survive the release and cancellation of the Obligations and the release and reconveyance or any partial release or reconveyance of this Security Instrument.

**ARTICLE 2**
**EVENTS OF DEFAULT**

**List of Events of Default.**  An Event of Default shall have occurred under this Security Instrument upon the occurrence of any of the following:

　　　　2.1.1.   Borrower fails timely to make any payment required by the Note, any future advances, or any of the other Loan Documents; or

　　　　2.1.2.   Borrower breaches any warranty or fails to perform any other covenant contained in this Security Instrument or any of the other Loan Documents, and does not cure that failure within the period of time, if any, that Lender may elect in its sole discretion to grant in writing to Borrower to cure that failure; or

　　　　2.1.3.   If Borrower or any Guarantor or any Indemnitor, if any, shall make an assignment for the benefit of creditors or if Borrower or any Guarantor or Indemnitor shall admit in writing its inability to pay, or Borrower's or any Guarantor's or any Indemnitor's failure to pay its debts as they become due; or

　　　　2.1.4.   If (i) Borrower or any subsidiary or general partner or member of Borrower, or any Guarantor or any Indemnitor, if any, shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or Borrower or any subsidiary or general partner or member of Borrower, or any Guarantor or any Indemnitor shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Borrower or any subsidiary or general partner or member of Borrower, or any Guarantor or any Indemnitor any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of sixty (60) calendar days; or (iii) there shall be commenced against Borrower or any subsidiary or general partner or member of Borrower or any Guarantor or any Indemnitor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not

have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) calendar days from the entry thereof; or (iv) Borrower or any subsidiary or general partner or member of Borrower, or any Guarantor or any Indemnitor shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii) or (iii) above; or (v) Borrower or any subsidiary or general partner or member of Borrower, or any Guarantor or any Indemnitor shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

**2.1.5.** Subject to Borrower's right to contest certain liens as provided in this Security Instrument, if the Property becomes subject to any mechanic's, materialman's or other lien other than a lien for local real estate taxes and assessments not then due and payable and the lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) calendar days; or

**2.1.6.** If any federal tax lien is filed against Borrower, any general partner of Borrower, any Guarantor, any Indemnitor, if any, or the Property and same is not discharged of record within thirty (30) calendar days after same is filed; or

**2.1.7.** Except as permitted in this Security Instrument, the actual or threatened alteration, improvement, demolition or removal of any of the Improvements without the prior consent of Lender; or

**2.1.8.** Damage to the Property in any manner which is not covered by insurance, which lack of coverage arises solely as a result of Borrower's failure to maintain the insurance required under this Security Instrument; or

**2.1.9.** Without Lender's prior consent, (i) Borrower engages a managing agent or manager for the Property, (ii) the managing agent if any for the Property resigns or is removed, (iii) the ownership, management or control of such managing agent is transferred to a person or entity other than the general partner, managing partner or managing member or Principal of the Borrower, or (iv) there is any material change in the property management agreement of the Property; or

**2.1.10.** This Security Instrument shall cease to constitute a first priority lien on the Property (other than in accordance with its terms); or

**2.1.11.** Seizure or forfeiture of the Property, or any portion thereof, or Borrower's interest therein, resulting from criminal wrongdoing or other unlawful action of Borrower, its affiliates, or any tenant in the Property under any federal, state or local law; or

**2.1.12.** If any default occurs under the Indemnity given by Borrower and Indemnitor, if any, to Lender and such default continues after the expiration of applicable notice and grace periods, if any; or

**2.1.13.** If any default occurs under any guaranty or indemnity executed in connection herewith and such default continues after the expiration of applicable grace periods, if any; or

**2.1.14.** Any other default or Event of Default occurs under this Security Instrument, the Note or any of the other Loan Documents, or a default occurs under any other agreement of Borrower relating to the Loan.

## ARTICLE 3
## REMEDIES

**3.1.**  **List of Remedies.** At any time following an Event of Default, Lender may, at its option, and without notice to or demand upon Borrower:

**3.1.1.**  Declare any or all indebtedness secured by this Security Instrument to be due and payable immediately;

**3.1.2.**  Enter onto the Property, and it shall be lawful for the Lender, by such officer or agents, servants and employees as it may appoint or by court appointed receiver, to take possession of the Property (with the relevant books, papers and accounts of the Borrower), and to hold, operate and manage such Property, and from time to time make all needful repairs, and such alterations additions, advances and improvements as to them shall seem wise; and to receive the rents, income, issues and profits thereof and out of them to pay all proper costs and expenses of so taking, holding and managing such Property, including reasonable compensation to the Lender, its agents, servants and employees and counsel, and any charges of the Lender hereunder, and any taxes and assessments and other charges prior to the lien of these presents which the Lender may deem appropriate to pay.  The remainder of the monies so received by it shall be utilized to pay interest and principal on Loan as provided herein;

**3.1.3.**  Cause Borrower to assemble any Personal Property and deliver it to Lender at a place designated by Lender;

**3.1.4.**  Bring a court action to foreclose this Security Instrument or to enforce its provisions or any of the indebtedness or obligations secured by this Security Instrument;

**3.1.5.**  Cause any or all of the Property to be sold under the power of sale granted by this Security Instrument in any manner permitted by applicable law;

**3.1.6.**  Exercise any other right or remedy available under any of the Loan Documents, or otherwise available under law or in equity, including without limitation, rights and remedies with respect to the Personal Property that are available to a Secured Party under the Uniform Commercial Code and rights and remedies set forth in Section 3.3 hereinbelow.

**3.2.**  **Appointment of a Receiver.** Upon the filing of a bill in equity, or other commencement of judicial proceedings to enforce the rights of the Lender, the Lender, as a matter of right, and without regard to the sufficiency of the security shall be entitled, if Lender in its sole discretion so desires, to the appointment (immediately and without notice to the Borrower, which is hereby waived) of a receiver of the Property, and of the income, rents, issues and profits thereof, pending such proceedings, with such powers as may be required to protect the interest of the Lender as the court making such appointment shall confer.

**3.3.**  **Acceleration; Remedies.**

**3.3.1**  At any time during the existence of an Event of Default, Lender, at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by Texas law or provided in this Security Instrument or in any other Loan Document. Borrower acknowledges that the power of sale granted in this Security Instrument may be exercised by Lender without prior judicial hearing. Lender shall be

entitled to collect all costs and expenses incurred in pursuing such remedies, including reasonable attorneys' fees, costs of documentary evidence, abstracts and title reports.

3.3.2.   If Lender invokes the power of sale, Lender may, by and through the Trustee, or otherwise, sell or offer for sale the Property and Improvements in such portions, order and parcels as Lender may determine, with or without having first taken possession of the Property and Improvements, to the highest bidder for cash at public auction.  Such sale shall be made at the courthouse door of the county in which all or any part of the land to be sold is situated (whether the parts or parcel, if any, situated in different counties are contiguous or not, and without the necessity of having any Personalty present at such sale) on the first Tuesday of any month between the hours of 10:00 a.m. and 4:00 p.m., after advertising the time, place and tends of sale and that portion of the Property and Improvements to be sold by posting or causing to be posted written or printed notice of sale at least twenty-one (21) days before the date of the sale at the courthouse door of the county in which the sale is to be made and at the courthouse door of any other county in which a portion of the land may be situated, and by filing such notice with the County Clerk(s) of the county(ies) in which all or a portion of the land may be situated, which notice may be posted and filed by the Trustee acting, or by any person acting for the Trustee, and Lender has, at least twenty-one (21) days before the date of the sale, served written or printed notice of the proposed sale by certified mail on each debtor obligated to pay the Indebtedness according to Lender's records by the deposit of such notice, enclosed in a postpaid wrapper, properly addressed to such debtor at debtor's most recent address as shown by Lender's records, in a post office or official depository under the care and custody of the United States Postal Service.  The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service.

3.3.3.   Trustee shall deliver to the purchaser at the sale, within a reasonable time after the sale, a deed conveying the Property and Improvements so sold in fee simple with covenants of general warranty.  Borrower covenants and agrees to defend generally the purchaser's title to the Property and Improvements against all claims and demands.  The recitals in Trustee's deed shall be prima facie evidence of the truth of the statements contained in those recitals.  Trustee shall apply the proceeds of the sale in the following order:  (a) to all reasonable costs and expenses of the sale, including reasonable Trustee's fees not to exceed five percent (5%) of the gross sales price, attorneys' fees and costs of title evidence; (b) to the Indebtedness in such order as Lender, in Lender's discretion, directs; and (c) the excess, if any, to the person or persons legally entitled to the excess.

3.3.4.   If all or any part of the Property and Improvements is sold pursuant to this Section, Borrower will be divested of any and all interest and claim to the Property and Improvements, including any interest or claim to all insurance policies, utility deposits, bonds, loan commitments and other intangible property included as a part of the Property and Improvements.  Additionally, after a sale of all or any part of the Property, Land, Improvements, Fixtures and Personalty, Borrower will be considered a tenant at sufferance of the purchaser of the same, and the purchaser shall be entitled to immediate possession of such property.  If Borrower shall fail to vacate the Property and Improvements immediately, the purchaser may and shall have the right, without further notice to Borrower, to go into any justice court in any precinct or county in which the Property and Improvements is located and file an action in forcible entry and detainer, which action shall lie against Borrower or its assigns or legal representatives, as a tenant at sufferance.  This remedy is cumulative of any and all remedies the purchaser may have under this Instrument or otherwise.

3.3.5   In any action for a deficiency after a foreclosure under this Security Instrument, if any person against whom recovery is sought requests the court in which the action is pending to determine the fair market value of the Property and improvements, as of the date of the foreclosure sale, the following shall be the basis of the court's determination of fair market value:

(a)     the Property and Improvements shall be valued "as is" and in its condition as of the date off foreclosure, and no assumption of increased value because of post-foreclosure repairs, refurbishment, restorations or improvements shall be made;

(b)     any adverse effect on the marketability of title because of the foreclosure or because of any other title condition not existing as of the date of this Instrument shall be considered;

(c)     the valuation of the Property and Improvements shall be based upon an assumption that the foreclosure purchaser desires a prompt resale of the Property and Improvements for cash within a six month-period after foreclosure;

(d)     although the Property and Improvements may be disposed of more quickly by the foreclosure purchaser, the gross valuation of the Property and Improvements as of the date of foreclosure shall be discounted for a hypothetical reasonable holding period (not to exceed 6 months) at a monthly rate equal to the average monthly interest rate on the Note for the twelve months before the date of foreclosure;

(e)     the gross valuation of the Property and Improvements as of the date of foreclosure shall be further discounted and reduced by reasonable estimated costs of disposition, including brokerage commissions, title policy premiums, environmental assessment and clean-up costs, tax and assessment, prorations, costs to comply with legal requirements and attorneys' fees;

(f)     expert opinion testimony shall be considered only from a licensed appraiser certified by the State of Texas and, to the extent permitted under Texas law, a member of the Appraisal Institute, having at least five years' experience in appraising property similar to the Property and Improvements in the county where the Property and Improvements is located, and who has conducted and prepared a complete written appraisal of the Property and Improvements taking into considerations the factors set forth in this Instrument; no expert opinion testimony shall be considered without such written appraisal;

(g)     evidence of comparable sales shall be considered only if also included in the expert opinion testimony and written appraisal referred to in the preceding paragraph; and

(h)     an affidavit executed by Lender to the effect that the foreclosure bid accepted by Trustee was equal to or greater than the value of the Property and Improvements determined by Lender based upon the factors and methods set forth in subparagraphs (a) through (g) above before the foreclosure shall constitute *prima facie* evidence that the foreclosure bid was equal to or greater than the fair market value of the Property and Improvements on the foreclosure date.

3.3.6    Lender may, at Lender's option, comply with these provisions in the manner permitted or required by Title 5, Section 51.002, of the Texas Property Code (relating to the sale of real estate) or by Chapter 9 of the Texas Business and Commerce Code (relating to the sale of collateral after default by a debtor), as those titles and chapters now exist or may be amended or succeeded in the future, or by any other present or future articles or enactments relating to same subject.  Unless expressly excluded, the Property and improvements shall include Rents collected before a foreclosure sale, but attributable to the period following the foreclosure sale, and Borrower shall pay such Rents to the purchaser at such sale. At any such sale:

(a)     whether made under the power contained in this Security Instrument, Section 51.002, the Texas Business and Commerce Code, any other legal requirement or by virtue of any judicial proceedings or any other legal right, remedy or recourse, it shall not be necessary for Trustee to have physically present, or to have constructive possession of, the Mortgaged Property (Borrower shall deliver to Trustee any portion of the Property and Improvements not actually or constructively possessed by Trustee immediately upon demand by Trustee) and the title to and right of possession of any such property shall pass to the purchaser as completely as if the property had been actually present and delivered to the purchaser at the sale;

(b)     each instrument of conveyance executed by Trustee shall contain a general warranty of title, binding upon Borrower;

(c)     the recitals contained in any instrument of conveyance made by Trustee shall conclusively establish the truth and accuracy of the matters recited in the Instrument, including nonpayment of the Indebtedness and the advertisement and conduct of the sale in the manner provided in this Instrument and otherwise by law and the appointment of any successor Trustee;

(d)     all prerequisites to the validity of the sale shall be conclusively presumed to have been satisfied;

(e)     the receipt of Trustee or of such other party or officer making the sale shall be sufficient to discharge to the purchaser or purchasers for such purchaser(s)' purchase money, and no such purchaser or purchasers, or such purchaser(s)' assigns or personal representatives, shall thereafter be obligated to see to the application of such purchase money or be in any way answerable for any loss, misapplication or non-application of such purchase money;

(f)     to the fullest extent permitted by law, Borrower shall be completely and irrevocably divested of all of Borrower's right, title, interest, claim and demand whatsoever, either at law or in equity, in and to the property sold, and such sale shall be a perpetual bar to any claim to all or any part of the property sold, both at law and in equity, against Borrower and against any person claiming by, through or under Borrower; and

(g)     to the extent and under such circumstances as are permitted by law, Lender may be a purchaser at any such sale.

**3.4     Waiver of Rights.**  Borrower waives all rights to direct the order in which any of the Property shall be sold in the event of any sale under this Security Instrument, and also any right to have any of the Property marshaled upon any sale.

**3.5.     Remedies are Cumulative.**  All remedies contained in this Security Instrument are cumulative, and Lender also has all other remedies provided by law, in equity, or in any other agreement between Borrower and Lender.  No delay or failure by Lender to exercise any right or remedy under this Security Instrument shall be construed to be a waiver of that right or remedy or of any default by Borrower.  Lender may exercise any one or more of its rights and remedies at its option without regard to the adequacy of its security.

**3.6.     Payment of Expenses.**  Borrower shall pay all of Lender's expenses incurred in any efforts to enforce any terms of this Security Instrument, whether or not any lawsuit is filed, including but not limited to legal fees and disbursements, foreclosure costs, escrow fees, filing fees, recording fees, and title charges.

**3.7.     No Cure or Waiver.** Neither Lender nor Trustee nor any receiver's entry upon and taking possession of all or any part of the Property, nor any collection of rents, issues, profits, insurance proceeds, condemnation proceeds or damages, other security or proceeds of other security, or other sums, nor the application of any collected sum to any Obligation, nor the exercise of any other right or remedy by Lender or any receiver shall cure or waive any breach, Default or notice of default under this Security Instrument, or nullify the effect of any notice of default or sale (unless all Obligations then due have been paid and performed and Borrower has cured all other defaults), or impair the status of the security, or prejudice Lender in the exercise of any right or remedy, or be construed as an affirmation by Lender of any tenancy, lease, or option or a subordination of the lien of this Security Instrument.

**3.8.     Power to File Notices and Cure Defaults.** Borrower hereby irrevocably appoints Lender and its successors and assigns as its attorney-in-fact, which agency is coupled with an interest, (a) to execute and record any notices of completion, cessation of labor, or any other notices that Lender deems appropriate to protect Lender's interest, and (b) upon the occurrence of a Default, to perform any obligation of Borrower hereunder; provided, that (i) Lender, as such attorney-in-fact, shall only be accountable for such funds as are actually received by Lender; and (ii) Lender shall not be liable to Borrower or any other person or entity for any failure to act under this section.

**ARTICLE 4**
**MISCELLANEOUS**

**4.1.     Invalidity.** The invalidity or unenforceability of any one or more provisions of this Security Instrument will in no way affect any other provision.

**4.2.     Notices.** All notices given under this Security Instrument must be in writing and will be effectively served upon personal delivery or, if mailed, no later than forty-eight (48) hours after deposit in first class or certified United States mail, postage prepaid, sent to Lender at its address appearing on the front page of this Security Instrument and sent to Borrower at its address appearing on the front page of this Security Instrument, which address may be changed by written notice.

**4.3.     Rights of Lender to Release Debtors or Security.** Without affecting Borrower's liability for the payment of any of the indebtedness secured by this Security Instrument, Lender may from time to time and without notice to Borrower (a) release any person liable for the payment of this indebtedness, (b) extend or modify the terms of that indebtedness, or (c) accept additional real or personal property of any kind as security, or alter, substitute or release any property securing that indebtedness, or (d) cause the Trustee to consent to the making of any map or plat of the Property, or to reconvey any part of the Property, or to join in granting any easement or creating any restriction on the Property, or to join in any subordination or other agreement affecting this Security Instrument.

**4.4.     Inspection Rights.** Lender may at any reasonable times enter upon and inspect the Property in person or by agent.

**4.5.     Release.** Upon payment of the indebtedness secured by this Security Instrument, Lender shall cancel and/or release this Security Instrument. Borrower shall pay Lender's reasonable costs incurred in releasing this Security Instrument.

**4.6.     Governing Law.** This Security Instrument and all rights and obligations hereunder shall be governed by and interpreted according to the laws of the state where the Property is located.

**4.7.     Use of Pronouns.** The term "Borrower" includes both the original Borrower and any subsequent owner or owners of any of the Property, and the term "Lender" includes the original Lender and also any future owner or holder, including pledges and participants, of the Note or any interests therein. Whenever the context requires, the singular includes the plural and vice versa and each gender includes each other gender.

**4.8.     Headings; Underlining.** The headings of the articles and sections of this Security Instrument are for convenience only and do not limit its provisions. The use of underlining in this Security Instrument is for convenience only, and the parties understand and agree that the presence or absence of underlining shall not be used in interpreting or construing this Security Instrument or any provision hereof.

**4.9.     Waiver.** Neither the acceptance of any partial or delinquent payment or performance nor the failure to exercise any rights upon a default shall be a waiver of Borrower's obligations hereunder. Lender's consent to any act or omission by Borrower will not be a consent to any other or subsequent act or omission or a waiver of the need for such consent in any future or other instance.

**4.10.    Successors and Assigns.** Subject to the provisions of Section 1.6 hereof, the terms of this Security Instrument shall bind and benefit heirs, legal representatives, successors and assigns of Borrower and Lender and the successors in trust of Trustee.

**4.11.    Joint and Several Liability.** If Borrower consists of more than one person or entity, each shall be jointly and severally liable to perform the Obligations of Borrower.

**4.12.    Trustee.**

**4.12.1.** Trustee may resign by giving notice of such resignation in writing to Lender. If Trustee shall die, resign or become disqualified from acting under this Instrument or shall fail or refuse to act in accordance with this Instrument when requested by Lender or if for any reason and without cause Lender shall prefer to appoint a substitute trustee to act instead of the original Trustee named in this Instrument or any prior successor or substitute trustee, Lender shall have full power to appoint a substitute trustee and, if preferred, several substitute trustees in succession who shall succeed to all the estate, rights, powers and duties of the original Trustee named in this instrument. Such appointment may be executed by an authorized officer, agent or attorney-in-fact of Lender (whether acting pursuant to a power of attorney or otherwise), and such appointment shall be conclusively presumed to be executed with authority and shall be valid and sufficient without proof of any action by Lender.

**4.12.2.** Any successor Trustee appointed pursuant to this Section shall, without any further act, deed or conveyance, become vested with all the estates, properties, rights, powers and trusts of the predecessor Trustee with like effect as if originally named as Trustee in this Instrument; but, nevertheless, upon the written request of Lender or such successor Trustee, the Trustee ceasing to act shall execute and deliver an instrument transferring to such successor Trustee, all the estate, properties, rights, powers and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and moneys held by the Trustee ceasing to act to the successor Trustee.

**4.12.3** Trustee may authorize one or more parties to act on Trustee's behalf to perform the ministerial functions required of Trustee under this Instrument, including the transmittal and posting of any notices.

4.13.  **Subrogation.** If, and to the extent that, the proceeds of the loan evidenced by the Note are used to pay, satisfy or discharge any obligation of Borrower for the payment of money that is secured by a pre-existing mortgage, deed of trust or other lien encumbering the Mortgaged Property (a "Prior Lien"), such loan proceeds shall be deemed to have been advanced by Lender at Borrower's request, and Lender shall automatically, and without further action on its part, be subrogated to the rights, including lien priority, of the owner or holder of the obligation secured by the Prior Lien, whether or not the Prior Lien is released.

4.14.  **No Change in Facts or Circumstances.** All information in the application for the loan submitted to Lender (the "Loan Application") and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan Application are complete and accurate in all material respects. There has been no material adverse change in any fact or circumstance that would make any such information incomplete or inaccurate.

4.15.  **Time of the Essence.** Time of the Essence as to all obligations under this security instrument.

4.16.  **Requests For Notice.** Borrower requests that a copy of any notice of default and notice of sale required by law be mailed to it at its address set forth above.

4.17.  **No Fiduciary Duty.** Lender owes no fiduciary or other special duty to Borrower.

4.18.  **Conformity of Remedies; Mortgage.** Any procedures or remedies provided herein shall be modified by and replaced with, where inconsistent with or required by, any procedures or requirements of the laws of the state in which the Property is located. In addition, should this instrument be or become ineffective as a Security Instrument, then these presents shall be construed and enforced as a realty mortgage with the Borrower being the Mortgagor the Lender being the Mortgagee.

4.19.  **Loan charges.** Borrower and Lender intend at all times to comply with the laws of the State of Texas governing the maximum rate or amount of interest payable on or in connection with the indebtedness (or applicable United States federal law to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If the applicable law is ever judicially interpreted so as to render usurious any amount payable under the Note, this Instrument or any other Loan Document, or contracted for, charged, taken, reserved or received with respect to the indebtedness, or if acceleration of the maturity of the indebtedness, or if any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by any applicable law, then Borrower and Lender expressly intend that all excess amounts collected by Lender shall be applied to reduce the unpaid principal balance of the indebtedness (or, if the indebtedness has been or would thereby be paid in full, shall be refunded to Borrower), and the provisions of the Note, this Security Instrument and the other Loan Documents immediately shall be deemed reformed and the amounts thereafter collectible under the Loan Documents reduced, without the necessity of the execution of any new documents, so as to comply with any applicable law, but so as to permit the recovery of the fullest amount otherwise payable under the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Lender does not intend to collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of the Indebtedness shall, to the extent permitted by an applicable law, be amortized, prorated, allocated and spread throughout the full term of the indebtedness until payment in full so that the rate or amount of interest on account of the indebtedness does not exceed the applicable usury ceiling. Notwithstanding any provision contained in the Note, this Security Instrument or any other Loan Document that permits the compounding of interest, including any provision by which any accrued interest is added to the principal amount of the indebtedness, the total amount of interest that Borrower is obligated to pay and

Lender is entitled to receive with respect to the indebtedness shall not exceed the amount calculated on a simple (i.e., noncompound) interest basis at the maximum rate on principal amounts actually advanced to or for the account of Borrower, including all current and prior advances and any advances made pursuant to the Security Instrument or any other Loan Document (such as for the payment of impositions and similar expenses or costs.)

    **4.20.**   **Entire Agreement.** This Security Instrument, the Note and the other Loan Documents represent the final agreement among the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements. There are no unwritten oral agreements among the parties.

# ARTICLE 5
## ASSIGNMENT OF LEASES AND RENTS

    **5.1.**   **Scope of Assignment.** Borrower hereby absolutely and irrevocably grants, sells, assigns, transfers and sets over to Lender:

        **5.1.1.**   **Rents.** All Rents now existing or hereafter created and affecting all or any portion of the Property or the use or occupancy thereof.

        **5.1.2.**   **Leases.** All of Borrower's right, title and interest in and to all leases, subleases, subtenancies, licenses, occupancy agreements and concessions covering Property or any portion thereof or space therein now or hereafter existing, including all modifications, amendments, extensions and renewals thereof, and all rights and privileges incident thereto (collectively **"Leases"**).

        **5.1.3.**   **Security Deposits.** All security deposits, guaranties and other security now or hereafter held by Borrower as security for the performance of the obligations of the Lessees under the Leases.

    **5.2.**   **Effect of Assignment.** This Assignment is intended by Borrower and Lender to create and shall be construed to create an assignment to Lender of all of Borrower's right, title and interest in the Rents and in the Leases, and shall be deemed to create a security interest therein for the payment of any indebtedness or the performance of any obligations of Borrower under the Note, the Trust Indenture or this Security Instrument. Borrower and Lender further agree that, during the term of this Assignment, the Rents shall not constitute property of Borrower (or of any estate of Borrower) within the meaning of 11 U.S.C. § 541, as amended from time to time.

    **5.3.**   **Grant of License.** By its acceptance of this Assignment and so long as an Event of Default shall not have occurred and be continuing hereunder, Lender hereby grants to Borrower a revocable license to enforce the Leases, to collect the Rents, to apply the Rents to the payment of costs and expenses incurred in connection with the development, construction, operation, maintenance, repair and restoration of the Property, and to any indebtedness secured thereby and to distribute the balance, if any, to Borrower.

    **5.4.**   **Revocation of License.** Upon the occurrence of an Event of Default, and at any time thereafter during the continuance of such default, Lender shall have the right to revoke the license granted to Borrower hereby by giving written notice of such revocation to Borrower. Upon such revocation, Borrower shall promptly deliver to Lender all Rents then held by Borrower and Lender shall thereafter be entitled to enforce the Leases, to collect and receive, without deduction or offset, all Rents

payable thereunder, including, but not limited to, all Rents which were accrued and unpaid as of the date of such revocation and to apply such Rents as provided in this Security Instrument.

5.5.  **Appointment of Borrower as Agent for Lender.**

5.5.1.  **Purpose of Appointment.**  Upon such revocation, Lender may, at its option, appoint Borrower to act as agent for Lender for the purpose of:

5.5.1.1.  Managing and operating the Property and paying all expenses incurred in connection therewith and approved by Lender.

5.5.1.2.  Enforcing the provisions of the Leases.

5.5.1.3.  Collecting all Rents due thereunder.

5.5.2.  **Notice to Borrower to Act as Agent.**  If Lender so elects, Lender shall give written notice thereof to Borrower and Borrower agrees to act as agent of assignee for the purpose or purposes specified in such notice. Borrower shall promptly comply with all instructions and directions from Lender with respect thereto. Borrower shall not be entitled to any management fee, commission or other compensation unless expressly agreed to in writing by Lender.

5.5.3.  **Deposit of Rents Collected.**  All Rents collected by Borrower as agent for Lender pursuant to this Section shall be immediately deposited in an insured account in the name of Lender in a bank or other financial institution designated by Lender. All Rents collected by Borrower and all amounts deposited in such account, including interest thereon, shall be the property of Lender and Borrower shall not be entitled to withdraw any amount from such account without the prior written consent of Lender.

5.5.4.  **Purpose of Agency.**  The agency hereby created shall be solely responsible for the purpose of implementing the provisions of this Assignment and collecting the Rents due Lender hereunder.  Nothing contained herein shall place upon Lender the responsibility for the management, control, operation, repair, maintenance or restoration of the Property nor shall Lender be liable under or be deemed to have assumed Borrower's obligations with respect to the Leases. Lender may at any time terminate the agency relationship with Borrower by written notice to Borrower.

5.6.  **Collection by Lender.**  Upon the occurrence of an Event of Default and at any time thereafter during the continuance thereof, Lender shall have the right, in addition to the rights granted pursuant to this Section 5.6 hereof, to collect all or any portion of the Rents assigned hereby directly or through a court-appointed receiver. Such right shall include any and all of the following:

5.6.1.  **Notice to Lessees to Pay Rents to Lender.**  The right to notify the Lessee or Lessees under the Leases, with or without taking possession of the Property, to demand that all Rents under such Leases thereafter be paid to Lender;

5.6.2.  **Enter and Possess the Property.**  The right to enter into possession of the Property, to assume control with respect to and to pay all expenses incurred in connection with the development, construction, operation, maintenance, repair or restoration of the Property, to enforce all Leases and to collect all Rents due there under, to apply all Rents received by Lender, to amend, modify, extend, renew and terminate any or all Leases, to execute new Leases, to execute new Leases and to do all other acts which Lender shall determine, in its sole discretion, to be necessary or desirable to carry out the purposes of this Assignment; and

**5.6.3. Specific Performance.** The right to specifically enforce the provisions of this Assignment and if Lender shall so elect, to obtain the appointment of a receiver pursuant to and in accordance with the provisions of this Security Instrument.

**5.7. Protection of Lessees.** Borrower and Lender agree that all Lessees under any Leases shall be bound by and required to comply with the provisions of this Assignment. In connection therewith, Borrower and Lender further agree as follows:

**5.7.1. Notice to Lessees of Assignment.** If requested by Lender, Borrower shall: (i) notify each Lessee under any Lease now affecting all or any portion of the Property of the existence of this Assignment and the rights and obligations of Borrower and Lender hereunder; (ii) provide each Lessee with a copy of this Assignment; and (iii) obtain such Lessee's agreement to be bound and comply with the provisions hereof.

**5.7.2. Reference to Assignment.** All Leases hereafter executed with respect to the Property or any portion thereof shall contain a reference to this Assignment and shall state that such Lessee shall be bound by and shall comply with the provisions hereof.

**5.7.3. Occurrence of Event of Default.** Upon the occurrence of an Event of Default and at any time thereafter during the continuance thereof, Lender may, at its option, send any Lessee a notice to the effect that: (i) an Event of Default has occurred and that Lender has revoked Borrower's license to collect the Rents; (ii) Lender has elected to exercise its rights under this Assignment; and (iii) such Lessee is thereby directed to thereafter make all payments of Rents and to perform all obligations under its lease or for the benefit of Lender or as Lender shall direct.

**5.7.4. Notice to Lessee to Comply with Leases.** Upon receipt of any such notice from Lender, each Lessee is hereby instructed by Borrower and Lender to comply with the provisions of such notice, to make all payments of Rents and to perform all obligations under the lease to and for the benefit of Lender or as Lender shall direct. Such notice and direction shall remain effective until the first to occur of: (i) the receipt by Lessee of a subsequent notice from Lender to the effect that such Event of Default has been cured or that Lender has appointed Borrower to act as agent for Lender pursuant to this Assignment; (ii) the appointment of a receiver pursuant to this Assignment, in which event such Lessee shall thereafter make payments of Rents and perform all obligations under the leases as may be directed by such receiver; or (iii) the issuance of an order of a court of competent jurisdiction terminating this Assignment or otherwise directing such Lessee to pay Rents and perform its obligations in a manner inconsistent with said notice.

**5.7.5. Lessee's Reliance on Notice from Lender.** Each Lessee shall be entitled to rely upon any notice from Lender and shall be protected with respect to any payment of Rents made pursuant to such notice.

**5.7.6. No Duty for Lessee to Investigate.** Each Lessee who receives a notice from Lender pursuant to this Assignment shall not be required to investigate or determine the validity or accuracy of such notice or the validity or enforceability of this Assignment. Borrower hereby agrees to indemnify, defend and hold such Lessee harmless from and against any and all loss, claim, damage or liability arising from or related to payment of Rents or performance of obligations under any lease by such Lessee made in good faith in reliance on and pursuant to such notice.

5.7.7.   **No Assumption by Lender of Lease Obligations.**   The payment of Rents to Lender pursuant to any such notice and the performance of obligations under any Lease to or for the benefit of Lender shall not cause Lender to assume or be bound by the provisions of such Lease, including, but not limited to, duty to return any security deposit to the Lessee under such lease unless and to the extent such security deposit was paid to Lender by Borrower.

5.7.8.   **Assignment Binding on Lessees.**   The provisions of this Section 5.7 are expressly made for the benefit of and shall be binding on and enforceable by each Lessee under any Lease now or hereafter affecting all or any portion of the Property.

5.8.   **Application of Rents; Security Deposits.**   All Rents received by Lender pursuant to this Assignment shall be applied by Lender, in its sole discretion, to any of the following:

5.8.1.   **First,** to pay any costs and expenses of collection of the Rents that may be incurred by Lender;

5.8.2.   **Second,** to pay any costs and expenses incurred by Lender in connection with the development, construction, operation, maintenance, repair or restoration of the Property;

5.8.3.   **Third,** to the establishment of reasonable reserves for working capital and for anticipated or projected costs and expenses of the Property, including, without limitation, capital improvements which may be necessary or desirable or required by law;

5.8.4.   **Fourth,** to the payment of any indebtedness then owing by Borrower to Lender; and

5.8.5.   **Thereafter,** to remit the remainder, if any, to the person or persons entitled thereto.

5.8.6.   In connection therewith, Borrower further agrees that all Rents received by Lender from any Lessee may be allocated, if Lender so elects, to the payment of all current obligations of such Lessee under its Lease and not to amounts which may be accrued and unpaid as of the date of revocation of Borrower's license to collect such Rents. Lender may, but shall have no obligation to, pursue any Lessee for the payment of Rents which may be due under its lease with respect to any period prior to the exercise of Lender's rights under this Assignment or which may become due thereafter. Lender shall not be liable to any Lessee for the payment or return of any security deposit under any Lease unless and to the extent that such security deposit has been paid to and received by Lender, and Borrower agrees to indemnify, defend and hold Lender harmless from and against any and all losses, claims, damages or liabilities arising out of any claim by a Lessee with respect thereto. Borrower further agrees that the collection of Rents by Lender and the application of such Rents by Lender to the costs, expenses and obligations referred to herein shall not cure or waive any default or Event of Default or invalidate any act (including, but not limited to, any sale of all or any portion of the Property or any property now or hereafter securing the Loans) done in response to or as a result of such Event of Default or pursuant to any notice of default or notice of sale issued pursuant to this Security Instrument.

5.9.   **Covenants of Borrower.**  Borrower agrees as follows:

5.9.1.   **No Amendment or Termination of Leases.**   Borrower shall not enter into, amend, modify or terminate any lease of all or any portion of the Property, except in accordance with the provisions of this Security Instrument;

      **5.9.2.**   **No acceptance of Advance Rent.**   Borrower shall not accept advance rent in excess of one (1) month from any Lessee without the prior written consent of Lender;

      **5.9.3.**   **Delivery of Leases.**   Upon request by Lender, Borrower shall provide Lender with true, correct and complete copies of all Leases, together with such other information relating to the Leases or to the Lessees thereunder as Lender shall reasonably request; and

      **5.9.4.**   **Lender's Rights to Inspect Books and Records.**   Upon request of Lender, Borrower shall make available to Lender all books, records, financial statements and other information relating to the Leases, the collection of all Rents, and the disposition and disbursement thereof.

    **5.10.**   **Priority of Assignment; Further Assurances.**   Borrower hereby represents and warrants that the Assignment of Rents hereby granted is a first priority assignment and that no other assignments of all or any portion of the Rents or the leases exist or remain outstanding.  Borrower agrees to take such action and to execute, deliver and record such documents as may be reasonably necessary to evidence such assignment, to establish the priority thereof and to carry out the intent and purpose hereof. if requested by Lender, Borrower shall execute a specific assignment of any lease now or hereafter affecting all or any portion of the Property.

    **5.11.**   **Lender Not Responsible for Borrower's Obligations.**   Nothing contained herein shall operate or be construed to obligate Lender to perform any of the terms, covenants and conditions contained in any lease or otherwise to impose any obligation upon Lender with respect to any lease, including, but not limited to, any obligation arising out of any covenant of quiet enjoyment therein contained in the event the Lessee under any such Lease shall have been joined as a party defendant in any action to foreclose and the estate of such Lessee shall have been thereby terminated. Prior to actual entry into and taking possession of the Property by Lender, this Assignment shall not operate to place upon Lender any responsibility for the operation, control, care, management or repair of the Property or any portion thereof and the execution of this Assignment by Borrower shall constitute conclusive evidence that all responsibility for the operation control, care, management and repair of the Property is and shall be that of Borrower, prior to such actual entry and taking of possession.

    **5.12.**   **Termination of Assignment.**   A full and complete release and reconveyance of this Security Instrument shall operate as a full and complete release of all of Lender's rights and interest hereunder.  Upon the recordation of such release and reconveyance, this Assignment shall thereafter be void and of no further effect.

    **5.13**   **Additional Provisions Regarding Assignment of Rents.**   This Article shall not be construed to require a pro tanto or other reduction of the Indebtedness resulting from the assignment of Rents. If the provisions of this Article and the preceding sentence cause the assignment of Rents to be deemed to be an assignment for additional security only, Lender shall be entitled to all rights, benefits and remedies attendant to such collateral assignment.  The assignment of Rents shall terminate upon the release of this Security Instrument.

THIS SECURITY INSTRUMENT IS A FIRST DEED OF TRUST. NO FURTHER DEEDS OF TRUST OR SECURITY DEEDS WILL BE RECORDED AGAINST THE PROPERTY WITHOUT THE PRIOR WRITTEN CONSENT OF THE LENDER. FAILURE TO COMPLY WITH THIS PROVISION SHALL CONSTITUTE A DEFAULT AND THE LOANS SHALL IMMEDIATELY BECOME DUE AND PAYABLE. CONSENT TO ONE FURTHER ENCUMBRANCE SHALL NOT BE DEEMED TO BE A WAIVER OF THE RIGHT TO REQUIRE SUCH CONSENT TO FUTURE OR SUCCESSIVE ENCUMBRANCES.

IN WITNESS WHEREOF, the undersigned have hereto set their hand and seal the above day and year above written.

BORROWER:

TRIUMPH CHRISTIAN CENTER, INC.

By: _____
Ladell Graham, Pastor/President

ATTEST:

_____
Gwendolyn Graham, Corporate Secretary

STATE OF TEXAS ) 
) ss.
COUNTY OF Fort Bend )

Before me, the undersigned, a Notary Public, in and for said state, on this __10th__ day of __December__, 2008, to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as its Pastor/President and acknowledged to me that he executed the same as his free and voluntary act and deed, and as the free and voluntary act and deed of the corporation for the uses and purposes therein set forth.

_____
Notary Public

My commission expires __08-13-2012__.

MARSHA GAYLE WILLIAMS
My Commission Expires
August 13, 2012

Exhibit "A"

Being a tract or parcel of land containing 23.00 acres, situated in the Joseph Kuykendall League, Abstract No. 48, Fort Bend County, Texas, and being part of that certain 5.000 acre Reserve "A", in the Tom R. Booth Estate Division No. 1 subdivision, as recorded in Slide 1206/A of the Plat Records of Fort Bend County, conveyed to MB Golf Academy Investors, L.P. in Fort Bend County Clerk's File No. 9814052, and part of that certain 63.796 acres out of the 83.796 acre Reserve "B" of said Tom R. Booth Estate Division No. 1, conveyed to MB Golf Academy Investors, L.P. in Fort Bend County Clerk's File No. 9814656, said 23.00 acre tract being more particularly described by metes and bounds as follows (with all bearings referenced to State Plane Coordinate System, South Central Zone, NAD '83):

COMMENCING at a 1-inch iron pipe found at the original intersection of the east right-of-way line of F.M. 762 (80' R.O.W.) with the south right-of-way line of the A.T. & S.F. Railroad (100' R.O.W.), being the northwest corner of said 5.000 acre Reserve "A";

THENCE South 83°11'15" East (called S80°18'51"E) along the north line of said Tom R. Booth Estate Division No. 1 subdivision, being the south right-of-way line of said A.T. & S. F. Railroad, a distance of 31.92 feet to a 5/8-inch iron rod with a Tejas cap set for the POINT OF BEGINNING and northwest corner of the herein described 23.00 acre parcel, same being the northeast corner of that certain 0.8712 acre Parcel 4 conveyed to the State of Texas for widening of F.M. 762 (140 feet wide) described in Fort Bend County Clerk's File No. 2005062694;

THENCE continuing South 83°11'15" East (called S80°18'51"E) along the north line of said Tom K. Booth Estate Division No. 1 subdivision, being the south right-of-way line of said A.T. & S. F. Railroad, a distance of 2163.15 feet to a capped 5/8-inch iron rod set for the northeast corner of the herein described parcel;

THENCE across said Reserve "B", the following twelve courses and distances:

South 06°48'45" West, 178.10 feet to a 5/8-inch capped iron rod set for an angle point;

North 83°11'15" West 70.21 feet to a 5/8-inch capped iron rod set for an angle point;

South 45°54'03" West, 93.50 feet to a 5/8-inch capped iron rod set for an angle point;

South 27°14'51" West, 173.96 feet to a 5/8-inch capped iron rod set for an angle point;

North 83°11'13" West, 596.14 feet to a 5/8-inch capped iron rod set for an angle point;

North 56°36'36" West, 67.58 feet to a 5/8-inch capped iron rod set for an angle point;

North 84°46'11" West, 176.92 feet to a 5/8-inch capped iron rod set for an angle point;

South 32°20'14" West, 77.94 feet to a 5/8-inch capped iron rod set for an angle point;

South 31°37'29" East, 52.77 feet to a 5/8-inch capped iron rod set for an angle point;

South 06°48'47" West, 86.68 feet to a 5/8-inch capped iron rod set for an angle point;

South 66°23'05" West, 80.85 feet to a 5/8-inch capped iron rod set for an angle point;

North 83°11'13" West, 757.44 feet to a 5/8-inch capped iron rod set for an intersect with the northeasterly right-of-way line of said F.M. 762, being also the northeast line of said 0.8712 acre tract;

THENCE North 20°37'38" West (called S20°12'35"E) along the northeasterly right-of-way line of said F. M. 762, being also the northeast line of said 0.8712 acre tract, crossing the common line of said Reserves "B" and "A", a distance of 503.76 feet to a capped iron rod set for the beginning of a curve to the right;

THENCE in a northwesterly direction, a distance of 197.48 feet along the northeasterly right-of-way line of said F.M. 762 (as widened to 110 feet), being also the northeast line of said 0.8712 acre tract, following the arc of a curve to the right, having a radius of 1567.00 feet and a central angle of 07°13'15" (Chord = N17°01'01"W, 197.35') to the POINT OF BEGINNING and containing 23.00 acres (1,001,880 square feet) of land, more or less.

## EXHIBIT B
## DESCRIPTION OF COLLATERAL

(a)     All buildings, structures and improvements of every nature whatsoever now or hereafter situated on the Land as described in Exhibit "A" ("Property"), and all fixtures, machinery, equipment, building materials, appliances and goods of every nature now or hereafter located on or upon, or intended to be used in connection with, the Land or the improvements thereon, including, but not by way of limitation, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light; and all elevators and related machinery and equipment: all plumbing; and all personal property and fixtures of every kind and character now or at any time hereafter located in or upon the Land or the improvements thereon, of which may now or hereafter be used or obtained in connection therewith, including, without limitation, fixtures, machinery, equipment, appliances, vehicles (excluding Debtor's personal automobiles, if any), building supplies and materials, books and records, chattels, inventory, accounts, farm products, consumer goods, general intangibles and personal property of every kind and nature whatsoever now or hereafter owned by Debtor and located in, on or about, or used or intended to be used with or in connection with the use, operation or enjoyment of the Land or any improvements thereon, including all extensions, additions, improvements, betterments, after-acquired property, renewals, replacements and substitutions, or proceeds from a permitted sale of any of the foregoing, and all the right, title and interest of Debtor in any such fixtures, machinery, equipment, appliances, vehicles and personal property subject to or covered by any prior security agreement conditional sales contract, chattel mortgage or similar lien or claim, together with the benefit of any deposit or payments now or hereafter made by Debtor or on behalf of Debtor, all trade names, trademarks, service marks, logos and goodwill related thereto which in any way now or hereafter belong, relate or appertain to the Land or any improvements thereon or any part thereof or are now or hereafter acquired by Debtor; and all inventory, accounts, chattel paper, documents, equipment, fixtures, farm products, consumer goods and general intangibles constituting proceeds acquired with cash proceeds of any of the property described herein, and all other interests of every kind and character in all of the real, personal, intangible and mixed properties described herein which Debtor may now own or at any time hereafter acquire, all of which are hereby declared and shall be deemed *to* be fixtures and accessions to the Land and a part of the Land as between the parties hereto and made all persons claiming by, through or under them.

(b)     All of the interest of Debtor in all easements, rights-of-way, licenses, operating agreements, strips and gores of land, vaults, streets, ways, alleys, passages, sewer rights, waters, water courses, water rights and powers, oil and gas and other minerals, flowers, shrubs, crops, trees, timber and other emblements now or hereafter located on the Land or under or above the same or any part or parcel thereof, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances, reversion and reversions and remainders, whatsoever, in any way belonging, relating or appertaining to the Land or any part thereof, or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or hereafter acquired by Debtor.

(c)     All income (but not limited to, all revenues, pledges, income, gifts, donations and offerings from whatever source owned by Debtor), rents, issues, royalties, profits, revenues and other benefits of the Land from time to time accruing, all payments under leases or tenancies, proceeds of insurance, condemnation awards and payments and all payments on account of oil and gas and other mineral leases, working interests, production payments, royalties, overriding royalties, rents, delay rents, operating interests, participating interests and other such

entitlements, and all the estate, right, title, interest, property, possession, claim and demand whatsoever at law, as well as in equity, of Debtor of, in and to the same (hereinafter collectively referred to as the "Revenues"); reserving only the right to Debtor to collect the Revenues as provided in the Deed of Trust, Assignment of Leases and Rents and Security Agreement executed by Debtor in favor of Secured Party.

(d)     All construction or development contracts, subcontracts, architectural agreements, labor, material and payment bonds, and plans and specifications relating to the construction of improvements on the Land including, without limitation (i) any engineering or architectural agreements entered into with respect to the design and other engineering or architectural services; (ii) the plans and specifications for the construction of said improvements prepared by any engineer or architect; and (iii) any agreements entered into with contractors, suppliers, materialmen or laborers with respect to construction of improvements on the Land.

(e)     If applicable, any and all management contracts, agreements, or other correspondence entered into by and between Debtor and third parties for the management of the collateral secured hereby.

(f)     Together with any and all additional items of personal property, furnishings, fixtures, equipment, furniture, trade fixtures, and other items of property not heretofore referenced above, including any and all musical instruments, church pews, chairs, pulpits, podiums, and all other items used in connection with the operation of the premises as a church and related church functions.

FILED AND RECORDED

OFFICIAL PUBLIC RECORDS

*Dianne Wilson*

2008 Dec 15 01:17 PM          2008127989
VCK $111.00
Dianne Wilson COUNTY CLERK
FT BEND COUNTY TEXAS